UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | NO. 2:06-CR-11 |
| | ) | |
| JOHN TRACY DAVIS | ) | |

**REPORT AND RECOMMENDATION**

The defendant has filed a motion to suppress all evidence seized pursuant to search warrants executed at his residence on the Elizabethton Highway and at his business known as "A-1 Limousine." (Doc. 38).

Both search warrants were supported by the single affidavit of Special Agent Michael Templeton of the Drug Enforcement Administration, and both warrants were executed on the same day, February 17, 2006. Defendant attacks the search warrants in five particulars: (1) that Agent Templeton's affidavit failed to establish probable cause that any of the alleged contraband would be found at defendant's residence or business, apart from Agent Templeton's "pure speculation;" (2) the warrants for both the residence and business were over-broad; (3) the applications for the search warrants were "insufficiently particular;" (4) the officers who executed the warrants exceeded the scope of the warrants; and (5) the executing officers broke down the door to defendant's residence without giving notice of their authority or purpose for being on the property, in violation of 18 U.S.C. § 3109. Each of these grounds will be addressed in turn.

## PROBABLE CAUSE TO SEARCH DEFENDANT'S RESIDENCE AND BUSINESS

Agent Templeton's affidavit recites that DEA Special Agents from Texas had received a report from an informant, whom those agents knew to be reliable and truthful, that he (the informant) had been told by Aldifonso Gonzales, Jr. (a co-defendant in this case) and a Johnny LNU that John Davis (defendant herein) from Bristol, Tennessee, wanted to purchase ten kilograms of cocaine for Eighteen Thousand ($18,000.00) Dollars per kilogram. Gonzales further advised the informant that Davis owned and operated A-1 Limousine Services in Bristol, Tennessee, and that he (Gonzales) had been supplying Davis with cocaine for approximately twenty years.

On February 14, 2006, the DEA agents in Texas recorded a telephone call between the informant and Gonzales and Johnny LNU, during which conversation both Gonzales and Johnny LNU told the informant that they were ready to obtain the ten kilograms of cocaine. Further, Johnny LNU told the informant during this recorded conversation that Davis had collected cash (currency) from different individuals to be used to purchase the cocaine. Moreover, Johnny LNU told the informant that he and Gonzales were staying at Davis' residence.

On February 15, 2006, Special Agent Templeton personally met with the informant, who related the same information he had previously provided to the special agents in Texas. Later that same day, Agent Templeton recorded a telephone call between the informant and Gonzales, in which Gonzales stated that both he and Johnny LNU were then staying at

2

Davis' residence in Bristol. Less than an hour later, law enforcement agents audio and video recorded a meeting among the informant, Gonzales, and Johnny LNU at a hotel room near the Tri-Cities Airport in Blountville; the agents noted that Gonzales and Johnny LNU arrived at the hotel in a 1998 gold Lexus bearing Texas license tag # ZRV-23X, registered to Gonzales. The meeting involving the informant, Gonzales, and Johnny LNU was recorded; Gonzales stated that both he and Johnny LNU had been staying with Davis, that Davis had given them both expense money, and that he (Gonzales) had been supplying multiple kilograms of cocaine and multiple pounds of crystal methamphetamine to defendant for many years. Gonzales went on to describe trips that defendant Davis had made to the Mexican border over the past five years to obtain crystal methamphetamine, as well as contacts Davis had in Florida to obtain one hundred kilograms of cocaine at a time. Gonzales ultimately told the informant that the defendant Davis had enough cash on hand to purchase eight (of the ten) kilograms of cocaine and that he was willing to trade vehicles for the remaining two kilograms of cocaine. In regard to the vehicles-for-cocaine deal, Gonzales stated that the defendant was willing to trade any vehicle on his car lot; in particular he named limousines, a black Ford Excursion, a black Lincoln Towne Car, a mini-van, and a Rolls Royce. Gonzales further stated that he and the defendant wished to take delivery of the ten kilograms of cocaine at the limousine business.

After this meeting involving the informant, Gonzales, and Johnny LNU, Gonzales was observed to return to Davis' residence on the Elizabethton Highway in Bluff City, Tennessee.

Some time later, in another recorded telephone conversation between the informant

3

and Johnny LNU, LNU told the informant that Davis had informed Gonzales that he would be willing to trade the black Ford Excursion for two kilograms of cocaine (in addition to paying cash for the other eight kilograms). The Excursion was, at that time, parked at defendant's limousine business.

On the following day (February 16, 2006), Agent Templeton recorded a telephone conversation between the informant and Johnny LNU, in which Johnny LNU stated that he, Gonzales, and Davis stood ready to purchase the ten kilograms on Friday, February 17, and that Davis intended to give Johnny LNU the Ford Excursion later that day (Thursday, February 16). Agent Templeton confirmed with the Tennessee Division of Motor Vehicles that the defendant owned a 2003 black Ford Excursion.

On February 16, 2006, Agent Templeton, in a meeting with Director Brian Bishop of the Tennessee Second Judicial Drug Task Force, learned that the Drug Task Force had been investigating defendant's drug trafficking activities for over ten years, and that from December 2005 to February 2006, the Drug Task Force Agency had conducted eight undercover purchases of illegal drugs at *defendant's business*, three of which involved the purchase of cocaine and methamphetamine directly from defendant himself.

To merely recite that Agent Templeton's affidavit provides probable cause to believe that Mr. Davis was trafficking in cocaine and methamphetamine is something of an understatement; in fact, the affidavit states an abundance of probable cause to believe that Mr. Davis was trafficking in large quantities of cocaine and methamphetamine. Although this Report and Recommendation has undertaken to provide a brief synopsis of Agent

4

Templeton's affidavit, the affidavit speaks for itself.

The affidavit provides more than ample probable cause to believe that evidence of drug trafficking would be found on defendant's business property. Drug deals had occurred on that property, and Mr. Davis had indicated he intended to transfer one of several vehicles on the car lot as payment for two kilos of cocaine. As far as his residence is concerned, it must be recalled that two known drug dealers, Aldifonso Gonzales and Johnny LNU, were extended guests at Mr. Davis' residence, and any reasonably intelligent person would believe that, more likely than not, there would be evidence of drug dealing on defendant's residence property. Moreover, "[i]n the case of drug dealers, evidence is likely to be found where the dealer's live." *United States v. Davidson*, 936 F.2d 856 (6th Cir. 1991).

Agent Templeton's affidavit stated probable cause to believe that evidence of illegal drug trafficking would be found at defendant's residence and his business.

### ***THE BREADTH OF THE WARRANTS***

As with the affidavit, the search warrants themselves are the best evidence to consult regarding their breadth. Suffice it to say that they authorized the executing officers to search for instruments (paraphernalia) used for packaging, cutting, weighing, and distributing illegal drugs, such as scales and baggies; telephone records regarding communications with co-conspirators, drug customers and drug suppliers; any papers relating to the transportation, purchase, and distribution of drugs; address books and the like which contain the names and addresses of drug customers and suppliers; United States currency, precious metals, jewelry, and financial instruments related to the proceeds of drug trafficking; and firearms and

5

ammunition used to protect the drug dealing business. It is stressed that the foregoing is not exhaustive, but merely examples of the type of evidence for which the warrants authorized a search. The evidence for which Agent Templeton sought a warrant was reasonably related to the drug trafficking business. There was nothing in either of these search warrants that has not been contained in a host of other warrants issued by this and other courts in this district. The warrants were not over-broad.

### *THE PARTICULARIZATION OF THE APPLICATIONS*

Everything that was stated above with reference to the breadth of the warrants applies equally to Agent Templeton's application. There is no need to belabor the issue. Everything for which Agent Templeton sought to search reasonably was related to the drug trafficking trade and, as noted at the outset, there was probable cause to believe that Mr. Davis was a long-time dealer in significant quantities of cocaine and methamphetamine.

### *THE SCOPE OF THE SEARCH VERSUS THE SCOPE OF THE WARRANTS*

In reality, this issue is a mixture of alleged lack of probable cause, over breadth, and insufficient particularization.

Based upon the affidavit of Special Agent Templeton, this Court issued a warrant authorizing him to search the property described as follows:

> . . . the residence of John Tracy Davis, located at 1351 Elizabethton Highway, Bluff City, Tennessee, and any and all outbuildings, appurtenances, storage areas, and vehicles associated therewith, located as follows: . . . .

The warrant then went on to describe in detail defendant's property at 1851

Elizabethton Highway in Bluff City, Tennessee. It is noted that the description of the property to be searched described defendant's residence as a mobile home attached to a 10' x 30' wooden deck and that there was a 16' x 32' swimming pool nearby, all of which were situated on a 1.62 acre tract cleared from a steep-wooded ridge. A satellite photograph was attached.

The executing officers searched the residence itself and, as the warrant authorized, all vehicles and outbuildings on the property also were searched. Defendant complains that the warrant should have, but did not, describe "with particularity" the outbuildings or vehicles that were searched. Somewhat in this same vein, he argues that the affidavit did not state probable cause to search any of the outbuildings or vehicles. Defendant relies upon *Knott v. Sullivan*, 418 F.3d 561 (6th Cir. 2005), to support his argument that (1) the outbuildings and vehicles should have been described with particularity, rather than simply as "outbuildings" and "vehicles;" and that the affidavit should have, but did not, state probable cause to justify the issuance of a search warrant for any specific outbuilding or vehicle.

Respectfully, *Knott* does not support defendant's argument. *Knott* involved a warrant that was used to seize a specific vehicle; however, the affidavit contained extensive errors regarding the vehicle to be searched: the vehicle's make and model were incorrect, the vehicle identification number was wrong, and the vehicle's license plate number was wrong. 418 F.3rd at 569. Defendant asks this Court to conclude from the *Knott* ruling that an affidavit must state probable cause to search each individual outbuilding and vehicle located on the residence property, and that each outbuilding and vehicle must be described with

7

particularity. However, there is a wealth of cases that hold to the contrary:

> When probable cause exists to search one building "within the curtilage of the property, there [is] no need to demonstrate probable cause to search each building on the property. *United States v. Campbell*, 256 F.3d 381, 390 (6th Cir. 2001); *see also, United States v. Bennett*, 170 F.3d 632, 639 (6th Cir. 1999) (upholding search of multiple buildings on property because "there is no need to search for evidence to link the outbuilding to the allegations in the affidavit; the shop building and the residence are sufficiently connected because they are both within the curtilage of the defendant's property"); *United States v. Watkins*, 179 F.3d 489, 505-06 (6th Cir. 1999) (Boggs, J., concurring) (collecting cases) (allowing search of outbuilding within sixty feet of main residence that "was not divided by any fence, residential dividing line or other device that would take it out of the normal designation of curtilage"); *United States v. Smith*, 783 F.3d 648, 652 (6th Cir. 1986). The Court finds no constitutional violation resulting in the search of the dwelling and other structures within the fence line.

*United States v. Popham*, 382 F.Supp.2d 942, 953 (ED Mich. 2005).

> Generally, "a warrant for the search of a specified residential premises authorizes the search of auxiliary and outbuildings within the curtilage." *United States v. Watkins*, 179 F.3d 489, 505 (6th Cir. 1999).

*United States v. Biles*, 2004 WL 1303353 (6th Cir. 2004).[1]

> The search of the outbuildings and vehicles did not violate the Fourth Amendment as the warrant described the premises to be searched with sufficient particularity and explicitly included all outbuildings and vehicles. *See, United States v. Gahagan*, 865 F.2d 1490, 1496 (6th Cir. 1989).

*Burns v. Bitnar*, 2000 WL 876550 (6th Cir. 2000).

---

[1]This case had its genesis in the Eastern District of Tennessee.

8

In *United States v. Scott*, 69 F.Supp.2d 1018 (ED Tenn. 1999), state law enforcement officers seized a sizable number of marijuana plants from an "outbuilding" on his property. The defendant complained that the warrant did not describe this "outbuilding" with particularity. Judge Edgar held:

> The search warrant in this case officially described the property to be searched. On its face, the warrant permitted a search of "the said person of the defendant and of the residence and any and all outbuildings and the vehicles on the premises," as described in the attached exhibit "A." [Exhibit A described only how to locate defendant's residence property.]

Defendant's property consisted of 1.62 acres on a steep ridge. Everything within that rather modest area was "within the curtilage," and a general and generic reference in the warrant to "outbuildings" and "vehicles" was more than adequate to uphold a search thereof. First, under the authority of *Popham, supra,* and the cases cited therein, the existence of probable cause to search the residence provides probable cause to search each outbuilding on the property. Further, assuming that the residence property itself is described with particularity, which it clearly was in this case, there is no requirement that any outbuildings or vehicles on that property themselves be described with particularity. *Burns v. Bitnar, supra; United States v. Biles, supra.*

The defendant seems to be making essentially the same argument with respect to the vehicles located on the premises at A-1 Limousine Service. In other words, he argues that the application and affidavit should have been directed toward a specific vehicle, that the

9

affidavit should have established probable cause to establish that specific vehicle, and that the resulting warrant should have been directed toward that specific vehicle. Of course, everything that has been said with respect to vehicles on defendant's residence property can be said with respect to his business property. Moreover, it cannot be overlooked that defendant was using his vehicles as in-kind payment for drugs.

In short, the affidavit established probable cause to search defendant's residence property, including all outbuildings and vehicles thereon, and it similarly established probable cause to search A-1 Limousine Service, including the vehicles located at that premises. The search warrants were sufficiently particular with respect to both searches.

### *THE "KNOCK-AND-ANNOUNCE" RULE*

This Court declined to hear any evidence on this issue simply because it has no relevance to this case in light of a recent decision of the United States Supreme Court which held that the Exclusionary Rule no longer applies to any evidence seized in violation of the Knock-and-Announce Rule. *Hudson v. Michigan*, 547 U.S. _____ (2006).

It is respectfully recommended that defendant's motion to suppress be DENIED.

Any objections to this report and recommendation must be filed within ten (l0) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1)(B) and (C). *United States v. Walters*, 638 F.2d 947-950 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985). The objecting party shall procure and file simultaneously with the objections a transcript of any testimony before the Magistrate Judge. If a transcript is not filed simultaneously

10

with the objections, the party filing the objections shall either (1) file a declaration that the transcript was ordered before the objections were filed and the date on which the party expects the transcript to be filed, or (2) affirmatively state that a transcript of the testimony presented to the Magistrate Judge is not needed for resolution of the objections. If a party files objections to this report and recommendation, the attorney for that party shall provide a copy of such objections to the opposing counsel on the same day the objections are filed, either by hand-delivery or facsimile transmission. The opposing counsel shall file his/her response to the objections within five business days of the date the objections are filed.

RESPECTFULLY SUBMITTED,

    s/Dennis H. Inman
Dennis H. Inman
United States Magistrate Judge

11

Case 2:06-cr-00011-JRG   Document 64   Filed 08/03/06   Page 11 of 11   PageID #: 11